REDMANN, Judge
(dissenting).
The facts are established that defendant was not only unwilling but, to plaintiff’s knowledge, financially unable to commit himself to a firm date on which he would begin paying the $1,181 monthly installments ; he would not have the money until his store was open and producing income from which the payments could be made. He did not even have the $8,000 initial payment customarily required at the time of making the contract, and was therefore allowed by the contract to await delivery to pay about half this amount.
Plaintiff was fully aware of defendant’s distressed cash position, through its salesman, its New Orleans district manager, and its Beaumont office which, precisely because of defendant’s position, approved the altogether unusual stipulation in the contract prepared by plaintiff itself, that payments were to commence “30 days after opening.”
There is no justification in the record, under the facts recited, for construing the stipulation other than as written, except to imply a reasonable time within which to open.[1] Plaintiff’s district manager himself testified on cross that plaintiff had approved the terms of the mortgage, drawn it up and had it signed, "On the assumption that this store was going to be open within a reasonable length of time(Emphasis supplied.)
Plaintiff did not show that defendant delayed opening beyond a reasonable time, under the circumstances of the Hurricane Betsy damage (and the commonly-known unavailability of sufficient labor force to make speedy repairs). To the contrary, plaintiff’s salesman testified defendant did not slow opening, and was “in good faith” in “his personal desire to open the store and wanting to get in business.”
In my opinion the proper conclusion on this point is that, insofar as the record shows, defendant did in fact open his store within a reasonable time under the circumstances.[2]
*627 Therefore, under the contract defendant’s first payment was not due until 30 days later, or May 28, 1966.
However, in spite of the unusual, specially bargained for and (because of defendant’s known financial position) indispensable stipulation that the first payment was due 30 days after opening, plaintiff’s Beaumont personnel had some clerical desire to place a firm date on its books, and, based on its New Orleans office’s advice that opening was expected September 1, 1965, the Beaumont bookkeeping department listed the first payment as due October 1, 1965, and shortly thereafter began to request and urge payment.
Meanwhile, back at the store, plaintiff’s other employees could not even complete the installation and make operative the equipment sold, because of the presence of other workers trying to fix up the store to be able to open, and it was not until November 22, 1965, that defendant accepted the installation as complete. (There was, of course, no claim by defendant that plaintiff breached its obligations because of the hurricane problem.)
Nevertheless, plaintiff continued to press for payment based not on the contract but on its October 1, 1965, book entry. Finally, on January 18, 1966, plaintiff threatened turning the account over to its legal department “for whatever action is necessary,” and defendant yielded to the threat and subsequently made four payments, at irregular times, in response to plaintiff’s persistent pressures.
In early April, 1966, defendant consulted an attorney, Mr. Gagliano, who advised him that under the contract no payment was due until 30 days after opening (which was then almost at hand). And, as late as April 1966, plaintiff was still acting on its bookkeeper’s conclusion the first payment was due October 1, 1965, and turned the matter over to a Louisiana attorney, Mr. Viccellio, and so instructed him. After Vic-cellio, discussed the matter with Gagliano, who pointed out the contractual language, plaintiff ultimately abandoned that untenable position. There was, however, no suggestion at that time that plaintiff and defendant had “renegotiated” their bargain.
However, plaintiff then adopted a new position, still finding their own contractual words unpalatable: they now insisted that the first payment was due 30 days after defendant accepted the installation as completed on November 22, 1966. In effect, they accepted the hurricane damage to the extent it delayed themselves, but not to the extent it delayed defendant.
On April 30, 1966, Viccellio wrote Gagli-ano about an unspecified “proposed compromise” stating they hesitated legal action “as it would no doubt, throw your client into bankruptcy.”
Gagliano testified he informed Viccellio on May 6 he had been busy with litigation and had been unable to discuss the matter with defendant.
By May 13, plaintiff’s counsel Viccellio writes about “the payment we claim was due on April 22”, offering to extend payments a month for $274. And the letter insisted “This would be with the definite understanding that the payments now made have all been paid in accordance with being due.” Defendant did not accept this “understanding” plaintiff sought to impose.
On May 18, a five-day ultimatum was delivered by Viccellio, threatening immediate lawsuit, noting
“We are sure you realize, as do we, that this would be expensive for both parties, but certainly your client is running the greatest risk under the circumstances, in view of his precarious financial shape.”
Again, there is no suggestion whatsoever of any “renegotiation" at this time, nor of any other reason why defendant was not entitled to the benefit of his bargain. It was simply might makes right.
At this time, of course, four payments having been made and the first having *628 been due May 28, 1966, defendant had already prepaid through August 28, 1966.
Nevertheless, Viccellio was at least right in one thing: defendant could not afford to fight, not even if he won. So on May 20 Gagliano sent a check “to cover what you have designated as the April 22 payment” and promised another check for “the payment you have designated as the May 22 payment” rather than pay the proposed additional $274 to pacify plaintiff, still insisting, nevertheless, “you have been paid in advance rather than in arrears.”
Plaintiff’s attorney was apparently as disinclined to read the words of that letter as he was those of the contract, for on. May 24 he wrote
“We are accepting these payments in this manner with the distinct understanding that they are sent as an acknowledgment that the first installment on this contract fell due on December 22nd and payments have been made for December, 1965, and January, February and March, 1966, plus the April payment which you have now made.
“Should this be improper understanding of the basis of this transmittal, please let me know.”
Obviously, plaintiff could not unilaterally convert defendant’s perfectly intelligible letter of May 20 into the “understanding” recited in plaintiff’s May 24 letter. This was, of course, the same “understanding” plaintiff had been attempting to force on defendant ever since it came to understand the insupportability of its bookkeeper’s October 1 date.
There followed from Viccellio brief letters of June 8 and June 16, and a long distance conversation between Viccellio and Gagliano, on June 29, 1966.
Then on June 29, Gagliano wrote Viccel-lio, enclosing a check of a newly-formed corporation “covering the installments due on May 22 and June 22” adding
“I have been assured that, due to new financing arrangements, all future payments on your contract will be made timely in accordance with the agreement.” (Emphasis supplied.)
In my opinion the fact defendant’s attorney referred to “the installments due on May 22 and June 22”, rather than use a cumbersome expression such as “the installments you have designated as those of May 22 and June 22” cannot, in the light of all that had previously happened, be interpreted to mean “I agree for Mr. Caval-lino and with his authorization that the payments are due May 22 and June 22.”
Nor, in my opinion, can his recital that he had been assured, “due to new financing arrangements”, be interpreted as a “renegotiation” or a new promise by defendant, under the circumstances of his transmitting a check from a new corporation and the conversation he had with Viccellio even as reported by Viccellio.
Viccellio testified, in respect to the June 29 phone conversation
“ * * * on June 29th after I returned to my office I conversed with Mr. Gagli-ano and he assured me that someone else was coming into the business and that money would be available. And that we could expect that they were going to incorporate the super market and that we could expect no later than July 8th the May and June payments * *
Viccellio further testified that Gagliano’s June 29 letter “assured me that future payments would be made” (which of course it did not).
Then, on examination by plaintiff, Vic-cellio testified:
“Q. During that telephone conversation and in that letter is there any protest or any kind of a protest that payments weren’t due?
“A. Well, Mr. Brown, we were negotiating and we arrived as I un *629 derstood the transaction at a definite payment date as of the 22nd of the month. And the payments were to begin on the contract as of December 22, 1965 in order to allow the payments made prior to my coming into the picture to carry the first four months of the contract. And he made to me one payment for April and then subsequently two payments, one for May and one for June, and this was at the very end of June.” (Emphasis supplied.)
This is the entirety of plaintiff’s case relative to any “renegotiation” or agreement to pay earlier than contracted for.
Gagliano, on the other hand, testified that the payment he sent on June 29 (which was not a check of defendant but of a newly formed corporation) was furnished by Mr. Neyrey, who was “becoming involved in the financial arrangements of the company” ; that Neyrey knew earlier payments had been made and that plaintiff wanted the continuance of payments; and that Neyrey told Gagliano
“That he felt that they could continue to make payments on that basis. But there was never any agreement or commitment by Mr. Cavallino or a corporate official that I knew of that they bound themselves to change the terms of the chattel mortgage.” (Emphasis supplied.)
It appears to me that plaintiff falls considerably short of proving that any “re^ negotiation”, or new promise by defendant to always pay early, ever occurred, and on that purely factual basis I would reverse the judgment appealed from.
There is, additionally, no legal basis for enforcing such a promise by defendant even if he made it, since there are no facts in the record to show there was ever any legal cause or consideration for his supposed new promise which, under LSA-C.C. art. 1893, would therefore be of no effect, and on that basis the judgment appealed from should in any case be reversed.
As of the June 29 payments, plaintiff had received a total of seven installments, the first of which was due May 28, 1966, and the last paid the obligation through November 28, 1966. This suit filed on October 11, 1966 to enforce the chattel mortgage was premature, and the sequestration and seizure should have been dissolved, and defendant’s demand for damages should now go to trial.[3]
I respectfully dissent.
Rehearing denied.
REDMANN, J., is of the opinion that a rehearing should be granted.

. Plaintiff’s argument that “30 days after opening” is a “condition”, even if not irreconcilable with plaintiff’s strenuous preopening collection efforts hereafter dis-discussed, is insupportable. There is no evidence whatsoever in this record to suggest the intent of the parties was “If I open, I will pay,” meaning also if I never open I will never be obliged to pay. Nor does the circumstance exist that plaintiff’s obligation to deliver and install the equipment was suspended by the “30 days after opening” clause; yet in true condition cases in bilateral contracts, e. g., “If a loan can be had, I will buy and you will sell”, the obligation of both parties are usually suspended by the condition (although it may exist for the benefit of one only). The grammatically “conditional” expression of the parties’ intent as reflected by the record is “If I open within a reasonable time, I will pay the first installment 30 days thereafter and another in each of the following 59 months; and if I do not open within a reasonable time I will nevertheless pay the first installment 30 days after what would have been a reasonable time, etc.” This is, of course, an unconditional (“simple”) obligation to pay the first installment 30 days after the passage of a reasonable time within which to open. The passage of such reasonable time is, it need hardly be pointed out, “in the course of nature, certain”, LSA-C.C. art. 2049. See LSA-C.C. arts. 2051, 2050, 2027, 1950 and 1951; also Aubry & Itau, Obligations § 303.

. Compare, analogously, LSA-C.C. art. 1933(2).

. While under my conclusion the question does not arise, and was not raised by counsel, I believe the unearned part of the $16,350 discounted interest in this contract is remitted by acceleration of maturity by the creditor, and the majority should have in any case reduced the amount of the judgment to that extent; Berger v. DeSalvo, 156 So.2d 323 (La. App.1963), cert. denied.